UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| F.O.A.N. PROPERTIES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 23-cv-191 |
| v. | ) | |
| | ) | Judge April M. Perry |
| OWNERS INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

This is an insurance coverage dispute between F.O.A.N. Properties, LLC ("Plaintiff") and

Owners Insurance Company ("Defendant"). The complaint alleges claims of breach of contract

(Count I), violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815

ILCS 505/2 (Count II), and bad faith in violation of 215 ILCS 5/155 (Count III). Defendant now

moves for summary judgment. Doc. 69. For the following reasons, Defendant's motion for

summary judgment is granted.

**BACKGROUND**

On April 7, 2020, a hailstorm damaged the properties at 4020 and 4030 Oakton Street in

Skokie, Illinois (the "Properties"). Doc. 82 ¶¶ 2, 24. At the time of the hailstorm, the Properties

were owned by Ira Kirsche ("Mr. Kirsche"), d/b/a Silk Limited Partnership ("Silk Limited"), and

occupied by a grocery store operated by Food of All Nations, LLC, d/b/a Sarah's Tent ("Sarah's

Tent"). *Id*. ¶¶ 1, 6.

Prior to the hailstorm, Sarah's Tent had purchased the grocery store and rented the space

for the grocery store from Mr. Kirsche. Doc. 82 ¶ 6; Doc. 95 ¶ 2. The grocery store sale included

an "Assignment and Assumption of Contracts," in which contracts with Constellation New

Energy, Inc. and Prospect Resources, Inc. were assigned to Sarah's Tent. Doc. 82 ¶¶ 50-51. Sarah's Tent also received from Mr. Kirsche an option to purchase the Properties. *Id.* ¶ 16. Finally, as part of its lease, Sarah's Tent agreed to maintain fire and casualty insurance on the Properties. Doc. 83-2 at 46. Sarah's Tent agreed that any loss payments under that insurance policy would be payable to Mr. Kirsche, and Mr. Kirsche agreed that he would then pay Sarah's Tent to restore the Properties. *Id.* The insurance policy ultimately obtained for the Properties (the "Policy") was issued by Defendant and named Mr. Kirsche as the insured. Doc. 82 ¶ 1. Sarah's Tent paid the Policy premiums. *Id.* ¶ 9. Thus, at the time of the hailstorm, Plaintiff was not a named insured under the Policy, was not the owner of the properties, and was not a tenant at the properties. *Id.* ¶ 15.

Plaintiff purchased the Properties on September 2, 2021 – approximately seventeen months after the hailstorm. *Id.* ¶ 22. Mr. Kirsche and the general manager of Sarah's Tent both testified that at the time of the purchase, Mr. Kirsche assigned to Plaintiff all his rights under the Policy.[1] Doc. 83-2 at 79, 126. On May 5, 2023, Plaintiff and Mr. Kirsche executed a "Retroactive Assignment" of rights under the Policy, purporting to memorialize this September 2021 agreement. Doc. 71-10.

On November 4, 2021, Silk Limited and T&T Public Adjusters, Inc. (the "PA") entered into a Public Adjustor Contract to determine the amount of damage caused by the hailstorm. Doc. 71-7. Plaintiff asserts that, although the contract listed Silk Limited as the contracting party,

---

[1] Sarah's Tent and Plaintiff have many of the same owners and were treated as "affiliates" by those owners. Doc. 91 ¶ 1. For example, the Sarah's Tent general manager also testified as Plaintiff's representative for this lawsuit, despite the fact that she was never employed by Plaintiff. Doc. 83-2 at 99. However, it appears that neither possesses an ownership interest in the other, and therefore the Court treats them as the separate legal entities that they are.

it was actually Plaintiff's representative who contracted with the PA on behalf of Plaintiff. Doc. 82 ¶ 24.

On November 5, 2021, Plaintiff filed a claim of loss under the Policy for the hailstorm damage from April 7, 2020. *Id.* ¶ 19. The Properties were inspected on November 10 and both parties had a representative present during the inspection. *Id.* ¶ 32. On November 15, Defendant issued an estimate of the loss of $35,058.95 actual cash value ("ACV") and $42,302.25 replacement cash value ("RCV") and mailed the payment to Mr. Kirsche. *Id.* ¶ 33. Enclosed with the check was a letter stating that "we believe that the enclosed repair estimate is an acceptable amount to repair or replace your covered damaged property … If there are any cost differences or newly discovered covered damage not included in the enclosed repair estimate, immediately report that information to the claims office." Doc. 71-1 at 173. The letter further stated that "[a]ll rights, terms, conditions, and exclusions in the Policy are in full force and effect and are completely reserved." *Id*. Sarah's Tent ultimately received the insurance payment from Mr. Kirsche. Doc. 82 ¶ 35.

Believing that Defendant owed more under the Policy, the PA issued to Defendant an estimate of $192,278.16 RCV on January 18, 2022. *Id.* ¶¶ 36-37. A component of this estimate was damage to the HVAC units at the Properties. *Id.* ¶ 38. Defendant retained an investigator to inspect the HVAC units. *Id.* ¶ 40. On February 14 or 15, the PA demanded an appraisal. *Id.* ¶ 45. Defendant responded on February 21, asking "why is appraisal being demanded prior to … inspection of the AC units? At this point, it seems like demanding appraisal is premature as we don't know what the extent of the damages may be." Doc. 71-1 at 185. The PA replied "[a]s for the appraisal; we agree we can wait till we know the extent of damages after the inspection of the HVAC units." *Id.*

Defendant received its investigator's inspection report on March 29 and issued an estimate of $82,802.79 ACV and $125,372.27 RCV on April 5. Doc. 82 ¶ 53. Defendant issued a second check to Mr. Kirsche on April 6 based upon the second estimate. Doc. 71 ¶ 54. Plaintiff claims that the check was sent through the mail, and that the PA was not aware of the estimate until April 11. Doc. 82 ¶ 54.

On April 27, 2022, appraisal was raised again by the PA. *Id.* ¶ 66. A week and a half later, the PA sent Defendant an estimate totaling $862,562.55. *Id.* ¶¶ 68-69. On May 25, Defendant denied the appraisal due to expiration of the two-year suit limitations clause in the Policy. *Id.* ¶ 72.

Plaintiff filed suit on November 29, 2022, and Defendant removed the case to federal court. Doc. 1.

## LEGAL STANDARD

Summary judgment is proper when the movant shows that there is no genuine dispute of material fact such that the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "A genuine dispute of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact; if they meet that burden, the party that bears the burden of proof must present facts showing there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *LaRiviere v. Bd. of Trs.*, 926 F.3d 356, 359 (7th Cir. 2019). To avoid summary judgment, the nonmovant must show more than metaphysical doubt as to the material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). While the court must construe the facts in the

4

light most favorable to the nonmovant and draw all reasonable inferences in their favor, this obligation does not extend to drawing inferences that are supported by only speculation or conjecture. *See Swetlik v. Crawford*, 738 F.3d 818, 829 (7th Cir. 2013).

## ANALYSIS

Defendant presents two arguments in support of its motion for summary judgment: (1) Plaintiff has no rights under the Policy and therefore cannot bring this claim at all; and (2) Plaintiff filed this lawsuit nearly eight months after the Policy deadline and therefore the suit is untimely. The Court addresses each argument in turn.

The Court first addresses Defendant's argument that Plaintiff does not have the right to bring this claim because Plaintiff was not the insured under the Policy, not the tenant at the Properties at the time of the hailstorm, and otherwise has no right to payment of Policy benefits. Although neither party argues it explicitly, the Court views this as a question of justiciability.

Article III of the Constitution limits the jurisdiction of the federal courts to "Cases" and "Controversies." U.S. CONST. ART. III, § 2. Article III standing requires that the plaintiff have "(1) a concrete and particularized injury in fact (2) that is traceable to the defendant's conduct and (3) that can be redressed by judicial relief." *Pucillo v. Nat'l Credit Sys., Inc.*, 66 F.4th 634, 637 (7th Cir. 2023) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). In addition to jurisdictional standing considerations, there are also prudential limitations on a federal court's ability to hear cases. "One well-established prudential limitation on justiciability is the principle that the named plaintiff cannot sue in federal court to assert the rights of a third party." *RK Co. v. See*, 622 F.3d 846, 851 (7th Cir. 2010). "A court determines whether the named plaintiff owns the claim by looking to applicable state or federal law." *Id*. Plaintiff bears the burden of establishing justiciability. *See, e.g., Spuhler v. State Collection Serv., Inc.*, 983

5

F.3d 282, 285 (7th Cir. 2020). To meet this burden at summary judgment, a plaintiff must set forth "by affidavit or other evidence 'specific facts' that, taken as true, support" the finding. *Id.*

Here, Plaintiff argues that its right to bring this claim arises from Mr. Kirsche's assignment of Policy benefits to Plaintiff in September 2021. An assignment occurs when an identifiable interest is transferred from the assignor to assignee. *See Illinois Tool Works, Inc. v. Com. & Indus. Ins. Co.*, 962 N.E.2d 1042, 1048 (Ill. App. Ct. 2011). It is a basic principle of assignments that they are void unless the assignor actually had something to assign. *See Cincinnati Ins. Co. v. Am. Hardware Mfrs. Ass'n*, 898 N.E.2d 216, 230 (Ill. App. Ct. 2008). Assignments are "subject to the same requisites for validity as are other contracts, such as intent, mutuality of assent, capacity to contract, legal subject matter, and consideration." *Id.* No particular form of assignment is required, and an assignment can be oral or written. *Hollywood Blvd. Cinema, LLC v. FPC Funding II, LLC*, 23 N.E.3d 381, 389 (Ill. App. Ct. 2014). When "there is no writing to evidence the intention to transfer some identifiable property, claim or right, it is necessary to scrutinize the surrounding circumstances and acts of the parties to ascertain their intentions." *Id.*

The Court finds that Plaintiff has met its burden of establishing facts that, if taken as true, would establish that an assignment of Policy benefits occurred when the Properties were sold to Plaintiff in September 2021. It is undisputed that Mr. Kirsche was the named insured under the Policy. Doc. 82 ¶ 1. Moreover, Mr. Kirsche testified that it was his understanding that as part of the sale of the Properties he transferred his right to insurance benefits under the Policy to Plaintiff. Doc. 83-2 at 79. Although there was no contemporaneous writing documenting the assignment, Illinois law allows oral assignments. *See Hollywood Blvd. Cinema, LLC*, 23 N.E.3d at 390 ("[B]ecause an assignment can be oral or written, … failure to execute a written

6

assignment would not render the assignment void.").[2]  And Mr. Kirsche's oral assignment was memorialized in the May 5, 2023 document entitled "Retroactive Assignment" when the parties stated that "on September 2, 2021, [Mr. Kirsche and Plaintiff] contemplated as part of the sale transaction that any and all insurance benefits for the Properties owned, due to or entitled to … under the Policy would transfer [to Plaintiff]." Doc. 71-10 at 2. Taken together, and viewed in the light most favorable to Plaintiff, these facts demonstrate that Mr. Kirsche had the intent to transfer rights under the Policy, that the transfer was supported by consideration, and that there was mutual assent by Plaintiff and Mr. Kirsche to assign the Policy benefits.[3]

Defendant argues that Mr. Kirsche did not have anything to assign to Plaintiff on September 2, 2021, because Sarah's Tent had already received the right to insurance proceeds prior to this date. In support of this argument, Defendant points to the "Assignment and Assumption of Contracts" signed when Sarah's Tent purchased the grocery store from Mr. Kirsche. The problem with this argument is that this written assignment named specific contracts that were assigned to Sarah's Tent, and the Policy is not named. Doc. 82 ¶¶ 50-51. Additionally, the grocery store sale was contemporaneous with the lease of the Properties to Sarah's Tent, and the lease makes clear that Sarah's Tent was responsible for obtaining insurance which would be paid out to Mr. Kirsche in the event of a loss. Doc. 95 ¶ 3. Although Sarah's Tent did not abide

---

[2] Plaintiff does not argue that it received any rights under the Policy prior to the hailstorm. This is wise, as the Policy contains an anti-assignment provision that required written consent from Defendant before a transfer of policy rights could occur. Doc. 71-1 at 157. This anti-assignment provision only prevented transfer of rights pre-loss, however, as Illinois courts do not uphold anti-assignment provisions post-loss. This is because "[a]n assignment after loss is not the assignment of the policy but the assignment of a claim or debt." *Illinois Tool Works, Inc. v. Commerce and Industry Ins. Co.*, 962 N.E.2d 1042, 1054 (Ill. App. Ct. 2011) ("[N]otwithstanding the existence of an anti-assignment or consent provision, a policy may be assigned after a loss without notice to or consent of the insurer, unless such is required by statute."). Therefore, the anti-assignment provision is not a bar to the September 2021 oral assignment.
[3] There are, of course, facts that undercut a finding of an oral assignment. Among others: that the PA was hired using Mr. Kirsche's company name, that the Claim was submitted in Mr. Kirsche's company name, and that Mr. Kirsche received and cashed both checks from Defendant. But at this stage, reasonable inferences must be drawn in Plaintiff's favor, not against it.

by the lease's requirement that the insurance be in Sarah's Tent's own name, and instead

obtained insurance in Mr. Kirsche's name, Sarah's Tent did ensure that property insurance was

obtained, that Mr. Kirsche had a right to payment of claims, and that the premiums were paid. It

does not make any sense that Sarah's Tent would have bothered to obtain insurance in Mr.

Kirsche's name if the parties had agreed that Mr. Kirsche was assigning the Policy to Sarah's

Tent.

Similarly uncompelling is Defendant's argument that Mr. Kirsche had no rights to assign

in September 2021 because a representative from Sarah's Tent testified that it "had" the Policy

before then. When read in context and drawing reasonable inferences in Plaintiff's favor, the

cited testimony from Sarah's Tent's general manager does not indicate that Sarah's Tent was

assigned the right to Policy benefits. Rather, the testimony centered on Sarah's Tent's

understanding that it was responsible for the Policy premiums:

> Q. Okay. During this period when Sarah's Tent was renting the properties, do you know
> whether [Defendant] was aware of who was paying these premiums?
>
> [objection omitted]
>
> A.  I don't know what the [Defendant] knew and what they didn't know. I knew that I had
> the policy, and I knew that I had to pay it.
>
> Q. Okay. And when you say "you," again, you're referring to Sarah's Tent, correct?
>
> A. Right.
>
> Q. Did Sarah's Tent ever communicate to [Defendant] that Sarah's Tent was the one
> paying the premium?
>
> [objection omitted]
>
> A. I don't know.

Doc. 71-2 at 28. Simply put, this vague statement that Sarah's Tent "had the policy" from a

person who continually represented that she was not an insurance or legal expert cannot support

8

a finding as a matter of law that Sarah's Tent received an assignment of Policy benefits from Mr. Kirsche. Doc. 71-2 at 31-32, 43, 48-49. "Had the policy" could have just as easily referred to "had responsibility for obtaining the Policy," or even, "had the policy on my desk to be paid."[4] Additionally, Defendant has not pointed to any evidence demonstrating that Mr. Kirsche agreed to assign his rights to Sarah's Tent, and thus the mutual assent required for a valid assignment is lacking.

For these reasons, the Court concludes that a reasonable juror could find that Mr. Kirsche had the right to insurance payments from the Policy on September 2, 2021. Moreover, a reasonable juror could conclude that Plaintiff and Mr. Kirsche entered into an oral assignment transferring those rights to Plaintiff when Plaintiff purchased the Properties. Therefore, Plaintiff has met its burden of demonstrating that Plaintiff may bring this claim.

The Court next turns to Defendant's argument that no matter who brought this claim, it is untimely due to the Policy's suit limitations clause. The Policy provision at issue states: "No one may bring a legal action against us under this Coverage Part unless … The action is brought within 2 years after the date on which the direct physical loss or damage occurred." Doc. 71-1 at 113. Given that the hailstorm occurred in April 2020, Defendant argues that Plaintiff's November 2022 lawsuit was more than seven months late. In response, Plaintiff acknowledges that the suit was brought more than two years after the hailstorm causing the loss but argues that the equitable doctrines of waiver or estoppel allow the Court to reach the merits of the case. Plaintiff further argues that to apply the Policy language would be unconscionable because a

---

[4] The same is true for the general manager's testimony that Sarah's Tent and Plaintiff both "inherited this insurance." Doc. 71-2 at 30-31. The general manager's testimony was uncertain at best, replete with phrases like "I think," "that's as much as I understand," and "I'm not the professional in this field." *Id.* at 30-32. To the extent the general manager testified to facts surrounding any transfer of rights, the Court credits that testimony. But the Court does not credit obviously inaccurate legal conclusions or speculation.

separate portion of the Policy prohibited Plaintiff from filing suit until an appraisal had been completed.

Under Illinois law, the "parties to a contract may agree to a shortened contractual limitation period to replace a statute of limitations, so long as it is reasonable." *Country Preferred Ins. Co. v. Whitehead*, 979 N.E.2d 35, 43 (Ill. 2012). Two-year periods to file insurance suits are considered reasonable. *Affiliated FM Ins. Co. v. Bd. Of Educ. Of City of Chicago*, 23 F.3d 1261, 1264 (7th Cir. 1994) (applying Illinois law to uphold 12-month period for bringing insurance suit). Failure to timely file necessarily subjects a suit to dismissal. *See, e.g., Koclanakis v. Merrimack Mut. Fire Ins. Co*., 899 F.2d 673, 677 (7th Cir. 1990) (affirming dismissal of suit as time barred at summary judgment); *Foamcraft, Inc. v. First State Ins. Co.*, 606 N.E.2d 537, 540 (Ill. App. Ct. 1992) (affirming dismissal of suit as time barred at motion to dismiss). "A limitation period is enforceable ... unless the insurer because of its conduct waives or is estopped from relying on the bar." *Florsheim v. Travelers Indem. Co. of Ill.*, 393 N.E.2d 1223, 1228-1229 (Ill. App. Ct. 1979).

The Court begins with Plaintiff's waiver and estoppel arguments. Waiver is an "intentional relinquishment of a known right," and "may be either expressed or implied, arising from acts, words, conduct, or knowledge of the insurer." *Home Ins. Co. v. Cincinnati Ins. Co.*, 821 N.E.2d 269, 282 (Ill. 2004). "An implied waiver arises when conduct of the person against whom waiver is asserted is inconsistent with any intention other than to waive it." *Id; see also Dustman v. Advoc. Aurora Health, Inc.*, 192 N.E.3d 47, 55 (Ill. App. Ct. 2021) ("An implied waiver must be *clearly* inferable from the circumstances. In other words, an implied waiver arises when conduct of the person against whom waiver is asserted is *inconsistent with any intention other than to waive the right*.") (emphasis in original). Whereas waiver depends upon

unilateral conduct by the party waiving the right, estoppel requires actions by both parties. Namely, "[e]stoppel arises when a party, by his word or conduct, intentionally or through culpable negligence, induces reasonable reliance by another on his representations and thus leads the other, as a result of that reliance, to change his position, to his injury." *Byron Cmty. Unit Sch. No. 226 v. Dunham-Bush, Inc.*, 574 N.E.2d 1383, 1386 (Ill. App. Ct. 1991). Estoppel is intended to prevent fraud and injustice. *Id.* Intent to mislead is not necessary and reliance by the other party must be reasonable. *Id.* "Cases in which an insurer's conduct is found to amount to estoppel typically involve a concession of liability by the insurer, advance payments by the insurer to the plaintiff in contemplation of eventual settlement, and statements by the insurer which encourage the plaintiff to delay filing his action." *Foamcraft, Inc.*, 606 N.E.2d at 540.

On this record, the Court finds no support for the argument that Defendant waived its rights under the Policy or otherwise should be estopped from claiming the protections of the suit limitations clause. It is undisputed that Plaintiff did not file any insurance claim until November 5, 2021 – nearly nineteen months after the April 7, 2020 hailstorm. Doc. 82 ¶ 19. Defendant paid out on the claim within ten days. The letter accompanying the payment stated that Defendant was reserving all rights under the Policy and asked for an immediate report if there was any disagreement about the estimate. Doc. 71-1 at 173. Despite this, Plaintiff waited another two months to send its own counter-estimate in January 2022. Doc. 82 ¶ 37. Thus, it was Plaintiff who was solely responsible for 21/24 of the suit limitations period running. The only action by Defendant that Plaintiff points to in support of its waiver and estoppel arguments is the February 21 email sent by Defendant to the PA which asked "why is appraisal being demanded prior to … inspection of the AC units? At this point, it seems like demanding appraisal is premature as we don't know what the extent of the damages may be." Doc. 71-1 at 185. From this single email

11

which does not discuss the suit limitations clause, Plaintiff claims to have been given a false sense of security that Defendant would not be invoking the suit limitations clause.

The problem with Plaintiff's waiver argument is that Illinois courts require more than ongoing negotiations between the parties to support a finding of waiver. *See, e.g., Myers v. Centralia Cartage Co*., 419 N.E.2d 465, 468 (Ill. App. Ct. 1981) ("The mere pendency of negotiations conducted in good faith and with a view of compromise, during the period of the statue of limitations …is not sufficient to show a waiver"). Specifically, Illinois courts look for "evidence of conduct calculated to lull the claimant into a reasonable belief that the case will be settled without suit and that the defense of the statute of limitations will not be asserted." *Arthur L. Larsen Co., Inc. v. Shefner*, 327 N.E.2d 257, 258 (Ill. App. Ct. 1975). The February 21 email, which discusses the order of operations for the inspection and appraisal, was part of the normal back and forth of the insurance claim process and cannot be reasonably be read to indicate either that the case was likely to settle or that the statute of limitations would not be asserted. *Ames v. Crown Life Ins. Co*., 406 N.E.2d 222, 225 (Ill. App. Ct. 1980) (finding no waiver where "the communications evidence an intention to process the claim according to established standards"). Unlike in those cases finding waiver, it cannot be said that Defendant delayed in addressing Plaintiff's claim or waited to deny the claim until the limitations period had run. To the contrary, the second estimate resulted in Defendant issuing a check within two weeks of the inspection and the day before the time to file suit elapsed, based upon a finding of $125,372.27 RCV, which was reasonably close to Plaintiff's last estimate of $192,278.16 RCV. Doc. 82 ¶¶ 36-37, 52, 54.[5] In short, the Court does not believe that a reasonable juror could conclude that the February 21 email supports a finding of intentional waiver by Defendant.

---

[5] To the extent bad faith is relevant, there has been no showing of bad faith by Defendant.

In addition to not establishing waiver, Plaintiff also has not shown that the doctrine of equitable estoppel applies. Specifically, Plaintiff has not pointed to any evidence that it actually relied (reasonably or otherwise) on Defendant's February email when deciding when to bring this suit. To the contrary, the undisputed facts show that it was the PA – Plaintiff's representative – who believed that once he had demanded an appraisal, the legal action deadline became "irrelevant." *Id.* ¶ 30. There is no evidence that the PA had this belief because of any statements by Defendant; the PA did not recall having any discussions at all with Defendant about the suit limitations clause. Doc. 71-8 at 65. But the PA did testify repeatedly that it was his belief that he did not need to consider the suit limitations deadline "because I sent them a demand for appraisal prior to the end date." *Id.* at 63. This is obviously incorrect as a matter of law. *Cf. Arora v. State Farm Fire & Cas. Co.*, 2025 IL App (2d) 240522, ¶¶ 39-40 (noting that "action" in a suit limitation provision refers to judicial proceedings). But what matters is that it was Plaintiff's representative's misunderstanding of the law that caused the suit to be filed after the deadline. Because Plaintiff relied on its own expert and not any actions by Defendant, Plaintiff's estoppel argument fails.

Finally, the Court addresses Plaintiff's assertion that enforcement of the suit limitations clause is unconscionable because Plaintiff was prohibited from filing suit until after an appraisal had been completed. The Policy provision at issue states:

> If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:
> a. Pay its chosen appraiser; and
> b. Bear the other expenses of the appraisal and umpire equally.
> If there is an appraisal, we will still retain our right to deny the claim.

13

Doc. 71-1 at 83.

In support of its argument, Plaintiff relies on *Norman v. Standard Fire Ins. Co.*, No. 22-CV-2199, 2023 WL 6018919, at *6 (C.D. Ill. May 15, 2023). *Norman* involved an insurance dispute in which the insurer moved to compel appraisal based upon the policy's appraisal provision which was nearly identical to the provision here. *Id.* The *Norman* court noted that appraisal provisions are interpreted based upon an "analysis of whether the dispute in question concerns coverage – in which case it stays with the court – or the value of a covered loss – in which case it goes to appraisal." *Id.* Because *Norman* involved a dispute about the value of the loss, the court concluded that appraisal was the appropriate first step, and moved the case to its inactive docket, with the note that either party could move to reopen the case at the conclusion of the appraisal. *Id.* at *13. *Norman* did not involve any questions about the statute of limitations, a suit limitations clause, or unconscionability. Nor did *Norman* hold that a plaintiff is prohibited from filing suit when there is an appraisal provision in a contract – it held only that, much like with an arbitration clause, a party may seek to compel appraisal after a suit is filed if the contract contains an appraisal provision. *Id.* at *5 ("Illinois law treats appraisal clauses as akin to arbitration clauses.").

The Court concludes that *Norman* provides no support for Plaintiff's argument that "a plaintiff cannot file suit under Illinois law until the appraisal is obtained." Doc 81 at 16. To the contrary, what *Norman* demonstrates is that lawsuits are appropriate mechanisms for forcing a reticent insurer to proceed to appraisal. *See also Khaleel v. Amguard Ins. Co.*, No. 21-C-992, 2022 WL 425733, at *3 (N.D. Ill. Feb. 11, 2022) (granting insured's motion for judgment on the pleadings in case where insured sought declaratory judgment compelling insurer to proceed with appraisal after its outright refusal and staying litigation until the outcome of the appraisal). And,

just like in *Norman*, had Plaintiff timely filed suit in this case the Court could have ordered appraisal and stayed the case pending the outcome, thus stopping the running of the suit limitations clock.

In lieu of any cases finding suit limitations clauses or appraisal clauses unconscionable, Plaintiff instead cites a litany of hypotheticals involving insurers who might "unilaterally, arbitrarily, capriciously (or for any other reason), walk out of an appraisal of disagreements with impunity because the page on the calendar turns." Doc. 81 at 16. Plaintiff's descriptions of such possibilities as being manifestly injurious to the public welfare, oppressive, and resulting in "bye-bye claim," Doc. 81 at 17, while dramatic, are not persuasive. Despite Plaintiff's repeated assertion that insureds have "no remedy at all" for such a possibility, the Illinois legislature has already dealt with this potential problem, at least in part. Specifically, 215 ILCS 5/143.1, tolls limitation periods in insurance contracts "from the date proof of loss is filed, in whatever form is required by the policy, until the date the claim is denied in whole or in part." Thus, a plaintiff does not need to worry about its time clock ticking while the insurer dithers about how to address a claim. *Cf. Hermanson v. Country Mut. Ins. Co*., 642 N.E.2d 857, 860 (Ill. App. Ct. 1994) (applying Section 143.1 to toll an insurance suit limitation period during the time period between the proof of loss and claim denial, and between the demand for arbitration and rejection of that demand). That said, once a claim is denied, plaintiffs are on notice that they have a viable suit and should proceed accordingly. *See Vala v. Pacific Ins. Co. Ltd*., 695 N.E.2d 581, 584 (Ill. App. Ct. 1998) (refusing to toll statute of limitations even though insurer agreed to reinvestigate claim after denial because "[n]either plaintiff nor any other insured should rely on an insurance company's agreement to reinvestigate a claim as if it were an agreement to vacate the denial and

15

start from scratch … the insured should file suit … even if prior to receipt of the company's report of the results of its reinvestigation.").[6]

A finding that a suit limitation period is contrary to public policy is "an extraordinary remedy," *Vansickle v. Country Mut. Ins. Co*., 651 N.E.2d 706, 707 (Ill. App. Ct. 1995), and Plaintiff has not cited any case finding similar provisions unconscionable. Given that limitations periods and appraisal clauses are standard in insurance contracts, the Court finds this dearth of case law significant. The Court declines to conclude that the appraisal provision renders the Policy's limitation period unconscionable. Because the language of the Policy was clear and unambiguous, Plaintiff was responsible for abiding by its terms. *Id*.

The Court concludes that Plaintiff's claim for breach of contract is untimely, and Defendant is entitled to judgment in its favor on Count I. Similarly, Count II (for deceptive business practices) and Count III (for bad faith) are also time barred. *See Wolf v. Riverport Ins. Co.*, 734 F. Supp. 3d 832, 837 (N.D. Ill. 2024), *aff'd*, 132 F.4th 515 (7th Cir. 2025) ("You can't have a claim about a bad-faith breach without a *breach*."); *Vansickle v. Country Mut. Ins. Co.*, 651 N.E.2d 706, 707 (Ill. App. Ct. 1995) ("[S]ince we uphold the limitation provision, [plaintiff's] allegations of unreasonable delay and deceptive practices are also without merit and properly dismissed by the circuit court.).

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted.

Dated: September 9, 2025

_____
APRIL M. PERRY
United States District Judge

---

[6] Plaintiff does not claim that a proof of loss was ever filed in this case, nor cite 215 ILCS 5/143.1 in its brief, and therefore has waived any right to relief under this provision.

16